J-S49045-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: E.C.F., III, A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.M.D., MOTHER, | |
| | No. 3824 EDA 2015 |

Appeal from the Order Entered November 25, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000041-2015
CP-51-DP-0000311-2013

===================================================

| | |
|---|---|
| IN THE INTEREST OF: E.L.F., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.M.D., MOTHER, | |
| | No. 3825 EDA 2015 |

Appeal from the Order Entered November 25, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000042-2015
CP-51-DP-0001326-2013

BEFORE: PANELLA, J., OLSON, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.: **FILED AUGUST 09, 2016**

Appellant, E.M.D. ("Mother"), appeals from the orders involuntarily terminating her parental rights to E.C.F., III (born in May of 2012) and E.L.F. (born in June of 2013) (collectively "the Children") pursuant to the

_____

*Former Justice specially assigned to the Superior Court.

Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and changing the Children's permanency goal to adoption under Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351.[1]  We affirm.

The relevant facts and procedural history of this case are as follows: In addition to the Children at issue, Mother has six other children, who are not Father's biological children.  On November 26, 2001, the family first came to the attention of the Philadelphia Department of Human Services ("DHS") due to allegations of Mother's drug use around her four eldest children.  Mother's parental rights as to her four eldest children were involuntarily terminated on September 21, 2006.  Thereafter, Mother had two other children, C.P. and E.P., who came to the attention of DHS in June 2010 due to suspected child abuse when E.P. had an unexplained black eye.

When E.C.F., III, was born, Mother and Father were unmarried, and were residing together with C.P. and E.P.  On June 11, 2012, a Child Protective Service ("CPS") report alleged that Father sexually abused C.P. On October 15, 2012, Mother and Father were arrested.  Father was charged with unlawful restraint/serious bodily injury, false imprisonment, endangering the welfare of a child, simple assault, possession of an instrument of a crime, and reckless endangerment, and Mother was charged

_____

[1] Father signed voluntary relinquishments of his parental rights to the Children, which he executed on June 25, 2015.  Father is not a party to this appeal and he has not filed a separate appeal.

with endangering the welfare of children in connection to C.P. and E.P. Thereafter, Mother voluntarily relinquished her parental rights to C.P. and E.P.

On February 12, 2013, DHS learned Mother was arrested and charged with child endangerment. On the same day, DHS obtained an Order of Protective Custody ("OPC") for E.C.F., III, and placed him in a foster home through Children's Choice. After DHS filed a dependency petition, an adjudicatory hearing was held on April 2, 2013, whereupon E.C.F., III, was adjudicated dependent and placed with T.S. ("Paternal Grandmother"). On April 30, 2013, a Family Service Plan ("FSP") was developed, which set the goal of reunification with Mother. Mother's goals were to (1) visit consistently with E.C.F., III; (2) obtain adequate and safe housing; (3) participate in a mental health evaluation; and (4) comply with all treatment recommendations including therapy. On May 1, 2013, Mother timely filed an appeal from the order adjudicating E.C.F., III, dependent, which was upheld by this Court on October 25, 2013. *See In Re E.F.*, 1245 EDA 2013 (Pa. Super. filed 10/25/14) (unpublished memorandum).

On June 25, 2013, during Mother's criminal trial for endangering the welfare of a child,[2] the trial court learned Mother gave birth to her eighth child, E.L.F. Because Mother did not answer truthfully to the trial court's

_____

[2] Mother was acquitted of the charge.

inquiry as to E.L.F.'s whereabouts, the trial court ordered DHS to file an OPC for E.L.F., committing E.L.F. to the custody of DHS. On June 27, 2013, the trial court conducted a shelter hearing and lifted the OPC. The trial court found that it was in E.L.F.'s best interest to remain in DHS's care. Following the hearing, E.L.F. was placed in Paternal Grandmother's home with E.C.F., III. On July 2, 2013, DHS filed a dependency petition. The trial court held an adjudicatory hearing on September 17, 2013, at which time E.L.F. was adjudicated dependent. On October 17, 2013, Mother timely filed an appeal from the order adjudicating E.L.F. dependent, which was upheld by this Court on May 16, 2014. *See In Re E.F.*, 2829 EDA 2013 (Pa. Super. filed 5/16/14) (unpublished memorandum).

On October 23, 2013, Mother participated in a parenting capacity evaluation, which recommended Mother participate in individual therapy, obtain appropriate housing, and maintain employment and appropriate child care resources. On December 4, 2013, a revised FSP was developed with a goal of reunification. Mother's objectives were the same as those included in the FSP from April 30, 2013. At a permanency hearing on April 22, 2014, Mother was found fully compliant with her FSP goals. At the subsequent permanency hearing on July 21, 2014, Mother was found substantially compliant.

On September 15, 2014, a Single Case Plan ("SCP") was developed. Under this plan, Mother's goals were to (1) attend family school with the

- 4 -

Children; (2) attend therapy; and (3) attend weekly-supervised visits with the Children. At the September 30, 2014, permanency review, Mother was found substantially compliant with these goals. At the February 2, 2015, hearing, Mother was found only moderately compliant with her goals. Because of the length of time the Children had been in DHS's care, the trial court instructed DHS to file petitions to terminate the parental rights of Mother and Father. On the same day, DHS filed petitions to change the goal to adoption and to involuntarily terminate Mother's and Father's parental rights to the Children.

On June 3, 2015, June 25, 2015, August 20, 2015, October 21, 2015, and November 25, 2015, the trial court held hearings on DHS's termination petitions as well as other related petitions filed by Mother. The trial court heard testimony from (1) Mother; (2) Lindsey Garrett, DHS social worker; (3) Tracy O'Donnell, Community Umbrella Agency ("CUA") case manager from Turning Points; (4) Madera Mohammed, CUA permanency specialist from Turning Points; (5) Dr. Erica Williams, Director of Forensic Interviewing at Assessment and Treatment Alternatives; (6) Daylynn Ross, Family Support social service worker; and (7) Maureen Townsend, licensed clinical social worker at Warren A. Smith. On November 25, 2015, the trial court entered the orders that terminated Mother's parental rights to the Children and changed their permanency goals to adoption.

On December 16, 2015, Mother timely filed notices of appeal, along with a concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Our standard of review regarding orders terminating parental rights is as follows:

> When reviewing an appeal from a[n order] terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the [order] must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005) (quotation omitted).

Additionally, in termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *Id.* at 806. We have previously stated that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and

resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003).

In the instant case, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8) and (b).[3] We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

With regard to the trial court's termination under Section 2511(a), Mother has developed no cogent argument with regard thereto. "The failure to develop an adequate argument in an appellate brief may result in waiver of the claim under Pa.R.A.P. 2119." *Commonwealth v. Beshore*, 916 A.2d 1128, 1140 (Pa. Super. 2007) (*en banc*) (citation omitted). It is well-settled that "[t]he 'argument' section of an appellate brief must contain a full discussion of the points raised accompanied by citation to pertinent authority." *In re Child M.*, 681 A.2d 793, 799 (Pa. Super. 1996) (citation

---

[3] At the conclusion of the termination hearing on November 25, 2015, the trial court did not state its reasons for the termination of Mother's parental rights to the Children. However, in its Rule 1925(a) opinion, the trial court exhaustively set forth its reasons and concluded termination of Mother's parental rights was appropriate under Section 2511(a)(1), (2), (5), (8) and (b).

omitted). Here, Mother has provided no argument as to the trial court's termination under Section 2511(a).

In any event, we note that there is competent evidence in the record to support the involuntary termination of Mother's parental rights under Section 2511(a)(2), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to

perform parental duties." ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by terminating Mother's parental rights under Section 2511(a)(2). During the termination hearing, Ms. Garrett, the DHS social worker, testified that Mother has had repeated contact with DHS since November 2001. N.T., 6/3/2015, at 6. Ms. Garrett provided the trial court with the history of the case concerning the removal of Mother's other six children and the circumstances leading to the placement in foster care of the Children at issue. ***Id.*** at 6-9. Ms. Garrett also testified about the suspected child abuse due to the various physical injuries sustained by the Children's sister, E.P., the allegations that Father sexually abused the Children's other sister, C.P., and Mother's failure to ensure the safety of her children by allowing Father to continue to have contact with them, which ultimately led to Mother's and Father's arrest. ***Id.*** at 8-10, 28-33.

Ms. O'Donnell, the CAU case manager, also testified concerning Mother's FSP/SCP goals. Specifically, she indicated Mother's goals were to be compliant with housing, Family School, family visits, and individual counseling. ***Id.*** at 88. Ms. O'Donnell testified that Mother was not consistent with her goal of individual therapy. Specifically, Mother was out of therapy from October or November 2014, and she was out of therapy

again from the end of January 2015 until the middle of April 2015. ***Id.*** Ms. O'Donnell further testified that Mother refused to sign release forms, preventing her new therapist from obtaining the parenting capacity evaluations. ***Id.*** at 89. Additionally, Ms. O'Donnell stated that Mother told her she was opposed to therapy because she was tired of rehashing the same issues as to why her children were taken away from her. ***Id.*** at 89-90. Ms. O'Donnell testified that Mother expressed to her that C.P. and E.P. lied about Father abusing them, and the Children should not have been removed from her care as she did not do anything wrong. ***Id.*** at 90, 114-19. Ms. O'Donnell testified that based on her observations, as well as conversations with Mother, Mother has not demonstrated that the Children are a priority in her life. ***Id.*** at 114.

Daylynn Ross, a Family School social service worker, observed Mother through home visits. Ms. Ross testified that Mother did not complete all of her assigned Family School goals. N.T. 10/21/15, at 178. Specifically, Ms. Ross testified that Mother displayed a lack of patience and was ineffective in disciplining E.C.F., III, and dealing with his tantrums. ***Id.*** Ms. Ross stated that, even though Mother attended Family School from August 2014 to June 2015, Mother was unsuccessful with developing a strong parent relationship with E.C.F., III. ***Id.*** at 177-79.

Dr. Williams, a licensed psychologist who works at Assessment and Treatment Alternatives as the director of forensic services, testified as an

expert in forensic parenting evaluations. Dr. Williams conducted a parenting capacity evaluation of Mother in 2011 and again in 2013 to determine Mother's capacity to provide safety and permanency to her children. *Id.* at 15-16. Dr. Williams testified that Mother had an "Axis 2 Diagnoses," which would impair her ability to parent the Children because it would impede her ability to notice when the Children were not receiving adequate care. *Id.* at 32-36. Dr. Williams was unconvinced Mother could provide for the Children's safety based on Mother's unwillingness to provide any understanding of her role in any of her children's removal or injuries. *Id.* at 25-28. Dr. Williams noted Mother continued a relationship with Father despite allegations that Father sexually abused her daughter. *Id.* Dr. Williams stated that, even if Mother was in a position to have the Children returned to her, there is enough history with her other children to realize that the Children may still be at risk. *Id.* at 44-45. Dr. Williams' overall recommendation was that Mother does not have the capacity to parent the Children as there still remains significant concerns regarding her ability to provide safety for the Children going forward. *Id.* at 118.

Instantly, the trial court concluded that Mother did not successfully complete her FSP/SCP objectives necessary for her to resume parental duties. Trial Court Opinion, 2/2/16, at 9. The trial court found that Mother's actions caused the Children to be without essential parental care. *Id.* at 9-10. The trial court determined that Mother has not remedied this condition

and is not likely to do so within a reasonable amount of time as her compliance with court orders decreased over time. *Id.* The trial court opined that Mother has been given ample time to place herself in a position to be a parent to the Children, but failed to avail herself of services to alleviate the conditions that led to the Children's removal. *Id.* Because the Children need a safe, nurturing, and permanent home, and Mother continues to refuse to put herself in a position to parent the Children, the trial court determined that DHS met its burden of clear and convincing evidence under Section 2511(a)(2). *Id.* We agree with the trial court's conclusion in this regard.

Next, we review the termination of Mother's parental rights under Section 2511(b), which provides, in relevant part, the following:

> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

Our Supreme Court has recently stated:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." The emotional needs and welfare of the child have been

properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." [T]his Court [has] held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 620 Pa. 602, 628-29, 71 A.3d 251, 267 (2013) (quotations omitted).

Here, Mother contends the trial court failed to consider whatever bonds may exist between her and the Children, as well as the emotional effect that termination will have upon the Children. Mother claims that the trial court baldly infers that the relationship between the Children and her was not proper. Mother further submits that there was no evidence from the psychologist regarding the deleterious impact termination will have on the Children. As such, Mother argues that the order terminating Mother's parental rights is not supported by clear and convincing evidence as to Section 2511(b). We find Mother's arguments unpersuasive and conclude that the record supports the trial court's decision to terminate Mother's parental rights.

For instance, in addition to Dr. Williams' testimony about Mother's parenting capacity evaluation, indicating she did not have the capacity to provide safety or permanency for the Children, DHS presented Ms. Mohammed, the permanency specialist at Turning Points for Children. Ms. Mohammed testified that, since September of 2014, she supervised Mother's visits with the Children at the visitation center. N.T., 10/21/15, at 125. Ms.

Mohammed testified that at the supervised visits Mother demonstrated she could not effectively control or discipline E.C.F., III. *Id.* at 126-28. Unlike Mother, Ms. Mohammed found Paternal Grandmother capable of disciplining E.C.F., III, as E.C.F., III, listens to Paternal Grandmother when she tells him to do something. *Id.* at 128. Ms. Mohammed testified that the Children's bond with Mother was not a parental bond; but rather, it was similar to a bond with any other friendly relative or friend. *Id.* at 158-59. Ms. Mohammed found Paternal Grandmother provides the Children with permanency and takes care of their daily emotional and physical needs. *Id.* at 156-59. Ms. Mohammed found that the Children are closely attached to and have a mother-child bond with Paternal Grandmother, who is to provide them with permanency. *Id.* at 134-40, 156-59. Ms. Mohammed opined that it is in the best interest of the Children to terminate Mother's parental rights. *Id.* at 136-39.

In the present matter, the trial court adequately considered the developmental, physical, and emotional needs of the Children. Moreover, the trial court thoroughly considered the Children's bond with Mother and the effect of severing that bond. The trial court found the testimony established that the Children are happy to see Mother and they know who she is, but they treat Mother like a friend because the relationship between her and the Children is not a maternal relationship. Trial Court Opinion, 2/2/16, at 13. Inasmuch as the Children have been placed by DHS with

Paternal Grandmother since June 2013, for their entire lives, the trial court concluded the Children would not suffer any irreparable harm by terminating Mother's parental rights. *Id.* at 11. The trial court found the Children have a parental bond with Paternal Grandmother. *Id.* at 13. Based on the testimony presented, the trial court found Paternal Grandmother provides for the Children's needs such as taking them to daycare, putting them to bed, and feeding them. *Id.* The trial court concluded it is in the best interest of the Children's welfare and well-being to be adopted and have permanency. *Id.* We conclude the trial court gave adequate consideration to the developmental, physical, and emotional needs of Children in determining that Mother's parental rights should be terminated pursuant to Section 2511(b), and the record supports the trial court's best interest analysis. *See In re M.G.*, 855 A.2d 68 (Pa. Super. 2004).

Finally, we address Mother's contention that the trial court erred in changing the permanency goal for the Children to adoption because it failed to give adequate consideration to the effects upon the welfare of the Children. *See* Mother's Brief, at 12.

This Court has stated:

When reviewing an order regarding the change of a placement goal of a dependent child pursuant to the Juvenile Act, 42 Pa. C.S.A. § 6301, *et seq.*, our standard of review is abuse of discretion. When reviewing such a decision, we are bound by the facts as found by the trial court unless they are not supported in the record.

*In re B.S.*, 861 A.2d 974, 976 (Pa. Super. 2004) (citation omitted).

- 15 -

Further,

In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (quotation omitted).

Section 6351(f) of the Juvenile Act sets forth the following pertinent inquiries for the reviewing court:

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

. . .

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

42 Pa.C.S.A. § 6351(f)(1)-(6), (9).

Additionally,

[t]he trial court must focus on the child and determine the goal with reference to the child's best interests, not those of the parents. "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." Further, at the review hearing for a dependent child who has been removed from the parental home, the court must consider the statutorily mandated factors. "These statutory mandates clearly place the trial court's focus on the best interests of the child."

*In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008) (emphasis in original) (citations and quotations omitted).

Here, the record reflects the trial court appropriately considered the Children's best interest in deciding to change the permanency goal to adoption. The competent evidence in the record supports the trial court's determinations that the Children have been in DHS's care for their entire lives, and the only home they have ever known is their placement with Paternal Grandmother, who they call "Mom." Trial Court Opinion, 2/2/16, at 6-7. The record also establishes that Mother does not have the capacity or skills to care for and keep the Children safe on a full-time basis. Moreover, the competent evidence supports the trial court's determination that the Children are in a nurturing and loving foster home and Paternal Grandmother provides for all their needs. *Id.* at 7. Accordingly, we find competent evidence in the record supports the trial court's determination that the Children's developmental, physical, intellectual, spiritual and emotional needs and welfare are being met by Paternal Grandmother. *Id.*

For all of the aforementioned reasons, we affirm the trial court's orders terminating Mother's parental rights on the basis of Section 2511(a)(2) and (b) of the Adoption Act, and changing Child's permanency goal to adoption under Section 6351 of the Juvenile Act.

Affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/9/2016</u>