J-S38001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: L.R.T.T., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D. T., FATHER | |
| | No. 674 EDA 2019 |

Appeal from the Decree Entered January 31, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000641-2018

| | |
|---|---|
| IN THE INTEREST OF: L.T., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.T., FATHER | |
| | No. 675 EDA 2019 |

Appeal from the Order Entered January 31, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000791-2017

BEFORE:   OTT, J., DUBOW, J., and COLINS*, J.

MEMORANDUM BY OTT, J.:                              **FILED JULY 30, 2019**

In these consolidated appeals, D.T. ("Father") appeals from (1) the order entered January 31, 2019, in the Philadelphia Court of Common Pleas Juvenile Division, which changed the permanent placement goal of his

_____

*   Retired Senior Judge assigned to the Superior Court.

daughter, L.R.T.T. ("Child"),[1] born in July of 2016, from reunification to adoption, and (2) the decree entered that same day which terminated his parental rights to Child, involuntarily.[2] In addition, Father's counsel has filed a petition to withdraw and brief in accordance with **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). Upon review, we grant counsel's petition to withdraw and affirm both the order and the decree.

The facts and procedural history underlying this appeal are well-known to the parties, and detailed in the juvenile court's opinion. **See** Juvenile Court Opinion, 4/17/2019, at 2-14. Accordingly, we need not reiterate them herein. In summary, the Department of Human Services ("DHS") has been involved in Child's life since her birth, when Mother tested positive for marijuana. Although Child went home with Mother initially, Mother's mental health issues presented a barrier to her ability to continue to care for Child. Accordingly, on May 2, 2017, Child was adjudicated dependent, and placed in foster care. Father has been incarcerated since before Child's birth. In January of 2017, he entered a guilty plea to charges of, *inter alia*, robbery, firearms and conspiracy. At the November 27, 2018, permanency review hearing, it was

---

[1] Although the caption at Docket No. 675 EDA 2019, refers to the child as "L.T." our review of the certified record reveals both dockets concern the same child, "L.R.T.T."

[2] Child's mother, S.B., voluntarily relinquished her parental rights to Child in July of 2018, and has not filed an appeal.

reported by his mother that he would be incarcerated for at least another three to five years.

When Child was initially placed in foster care, the goal was to return her to her parent(s). On July 25, 2018, Mother signed a petition to voluntarily relinquish her parental rights. Thereafter, on August 29, 2018, DHS filed: (1) a petition for goal change to adoption; (2) a petition to confirm Mother's voluntary relinquishment of her parental rights; and (3) a petition to involuntarily terminate Father's parental rights. Father participated, *via* telephone, in a permanency review hearing conducted on November 27, 2018. At that time, counsel indicated Father intended to voluntarily relinquish his parental rights to Child **See** N.T., 11/27/2018, at 7-8, 20-21. The court held the matter under advisement until Child's case manager could take the voluntary relinquishment paperwork to Father. **Id.** Although Father never signed a voluntary relinquishment document, on January 31, 2019, the trial court entered an order changing Child's permanency goal to adoption, and a decree involuntarily terminating Father's parental rights. Father filed timely notices of appeal from both the order and decree on March 4, 2019, accompanied by concise statements of errors complained of on appeal.[3] On

---

[3] We note Father properly filed separate notices of appeal for each docket. **See Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018). Moreover, although the notices of appeal were not filed until March 4, 2019, they were still timely. The 30th day after January 31, 2019, when the order and decree at issue were entered, was Saturday, March 2, 2019. Therefore, Father had until the following Monday, March 4, 2019, to file a timely appeal. **See** Pa.R.A.P. 903(a); 1 Pa.C.S. § 1908.

May 20, 2019, Father's counsel filed a motion to withdraw and *Anders* brief in this Court.

We begin by addressing counsel's request to withdraw and *Anders* brief. *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) ("When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.") (quotation omitted). This Court extended the *Anders* procedure to appeals from decrees terminating parental rights involuntarily in *In re V.E.*, 611 A.2d 1267 (Pa. Super. 1992), and to appeals from goal change orders in *In re J.D.H.*, 171 A.3d 903 (Pa. Super. 2017).

To withdraw pursuant to *Anders*, counsel must comply with the following requirements:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citation omitted). Counsel must provide this Court with a copy of the letter advising the appellant of his or her rights. *See Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, our Supreme Court has set forth the following requirements for *Anders* briefs:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, *supra*, 978 A.2d at 361.

In the instant matter, counsel filed a petition to withdraw and **Anders** brief stating he conducted a review of the record and determined that Father's appeal is "wholly frivolous and without support in the law or the facts." Motion to Withdraw as Counsel, 5/20/2019, at ¶ 5. The **Anders** brief includes a summary of the facts and procedural history of this case, a list of issues that could arguably support the appeal, and counsel's assessment of why those issues are frivolous, with citations to the record and relevant legal authority. Counsel also provided this Court with a copy of his letter to Father, advising him of his right to obtain new counsel or proceed *pro se*.[4] Moreover, we note that Father has not filed a response to counsel's petition. Therefore, we find counsel has complied with the requirements of **Anders** and **Santiago**, and we may proceed to review the issues outlined in his brief. Additionally, we must "conduct an independent review of the record to discern if there are any

---

[4] Counsel indicated in his letter that he had enclosed a copy of the **Anders** brief.

- 5 -

additional, non-frivolous issues overlooked by counsel." ***Commonwealth v. Flowers***, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

Counsel's ***Anders*** brief presents the following issues for our review: (1) whether the trial court erred by involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b); and (2) whether the trial court erred by changing Child's permanency goal to adoption. ***See Anders*** Brief at 5-6.

We begin by considering the order changing Child's permanent placement goal from reunification to adoption. Father contends the goal change was "not the disposition best suited to the safety, protection and physical, mental and moral welfare" of Child. ***Anders*** Brief at 15.

Our standard of review when considering a permanency goal change is whether the juvenile court abused its discretion. ***See In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). As such, we must accept the juvenile court's findings of fact and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law. ***Id.***

The Juvenile Act governs proceedings to change a child's permanent placement goal. ***See*** 42 Pa.C.S.A. §§ 6301-6375. Trial courts must apply the following analysis:

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances

which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-1089 (Pa. Super. 2011) (citations and quotation marks omitted).

In concluding that a goal change was warranted and appropriate in the present case, the trial court opined:

> [Child's Community Umbrella Agency ("CUA") case manager with Bethanna, Ameenah Wright,] provided the Court with competent and persuasive evidence that reasonable efforts were made by [DHS] to contact and offer assistance to Father while he was in prison. Ms. Wright testified she mailed Father paper work, however, he never responded and he refused to engage with CUA. She further provided testimony that Father was aware of the placement of the Child and even with that knowledge, he refused to cooperate with the CUA and [DHS].
>
> The Pennsylvania Juvenile Act, as amended to reflect the principles of the Federal Adoption and Safe Families Act (ASFA) which focuses on safety and permanency as the paramount concerns in planning for dependent children, ranks the permanency options for children using a hierarchical priority. The permanency options are listed first to last and each preceding option must be ruled out before the next can be chosen as a vialbe permanency option. The Superior Court detailed this hierarchy in its decision in *In Re: B.S.*, 861 A.2d 974 (Pa. Super. 2004). Pursuant to the hierarchy of permanency option, the option of "placement with a legal custodian" is listed third. Once reunification is ruled out, the second preferred permanency option is adoption. Adoption has been clearly established as the appropriate goal in the best interest of this Child.

Juvenile Court Opinion, 4/17/2019, at 24.

- 7 -

Our review of the record reveals no abuse of discretion on the part of the juvenile court. Father has been incarcerated since before Child's birth, and Father's mother indicated he had to serve "at least another three to five years" as of June of 2018. N.T., 11/27/2018, at 15. There is no evidence Father made any effort to comply with the family service plan, and, in fact, he refused to talk to Child's case manager. *See id.* at 13-14. Furthermore, Father has never had any contact with Child since her birth. *See id.* at 14-16. Conversely, as of the November 2018 hearing, Child had lived with the same foster mother for 12 months, foster mother is a pre-adoptive resource, and Child looks to foster mother for love, protection and support. *See id.* at 16-17. Therefore, considering the factors listed in Section 6351(f), the juvenile court properly determined changing Child's placement goal from reunification to adoption was in Child's best interests. *See A.B.*, *supra*.

We next consider Father's contention that the juvenile court abused its discretion in involuntarily terminating his parental rights. *See Anders* Brief at 14. We apply the following standard of review when considering the propriety of a termination decree:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the juvenile court terminated Father's parental rights pursuant to Section 2511(a)(1), (2), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision pursuant to Section 2511(a)(2) and (b), which provides as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without

> essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
>
> * * *

23 Pa.C.S.A. § 2511(a)(2), (b).

Father contends the court abused its discretion in terminating his rights under Subsection 2511(a)(2) because neither DHS nor the Community Umbrella Agency ("CUA") provided "reasonable efforts to reunite" Father with Child. *Anders* Brief at 14. He also asserts "termination of his parental rights would not best serve the developmental, physical and emotional needs" of Child pursuant to Subsection 2511(b). *Id.* at 21.

Considering first the grounds for termination under subsection 2511(a)(2), we note:

> . . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

The juvenile court summarized the evidence supporting its decree as follows:

> This Court heard credible, persuasive evidence from Ameenah Wright, CUA case manager with Bethanna. She testified the family became known to DHS because of housing issues, bed bug issues and issues of neglect. She stated [an Order of Protective Custody ("OPC")] was obtained for the Child on 5/2/2017, and she was adjudicated Dependent based on present inability. She reviewed the case and was assigned as case manager in November 2017. Base on her review, Father was never involved in the caring for the Child and was incarcerated. CUA and DHS conducted Single Case Plan meetings and Father's objectives were to complete parenting classes while he was in prison and respond to CUA outreach. Ms. Wright testified she held Single Case Plan meetings on 4/25/20[1]8, 8/01/2018 and 10/16/2018, and communicated Father's objectives to him by mail to the prison.

> Ms. Wright testified she also had telephone conversations with Father's social worker in prison regarding Father's objectives. She noted she never received any verification that Father had completed parenting classes, and Father's social worker confirmed that Father refused to engage with CUA. Father has never provided a list of supports that could assist with caring for the Child. Ms. Wright further testified that to her knowledge Father has never had contact with the Child and never been involved with her care.

… This Court found the evidence supported [the] conclusion that Father lacks the present and future capacity to provide parental care, control or subsistence necessary for the Child's physical and mental well-being. Father cannot provide for the Child's basic needs nor can he provide a structured environment for this two and one-half year old Child.

This Court found that DHS proved by clear and convincing evidence that Father is incapable of providing safety and permanency for his Child now and in the future. This Court is not persuaded that Father can or will remedy the conditions which continue to exist and which brought the Child into supervision. Based on the clear and convincing evidence presented, this Court terminated Father's parental rights pursuant to 23 PA.C.S.A. § 2511(a)(1), and (2).

Juvenile Court Opinion, 4/17/2019, at 20-21.

Our review of the record reveals ample support for the court's findings. Indeed, Child's case manager testified that during her involvement with the case, Father had no contact with Child, except for sending her one letter.[5] *See* N.T., 11/27/2018, at 14-15. Father did not complete any parenting classes in prison, or make any attempt to communicate with CUA. *See id.* at 13-14. In fact, Father's prison social worker told Child's caseworker that "he refused to engage CUA." *Id.* at 14. Moreover, Father has been incarcerated since before Child's birth, and, as of June of 2018, had to serve "at least another three to five years." *Id.* at 15. Accordingly, we agree with the juvenile court's determination that DHS presented clear and convincing evidence of Father's "repeated and continued incapacity" to care for Child, which caused his daughter to be "without essential parental care, control or

_____

[5] The record does not reveal any details about the letter or when it was sent.

- 12 -

subsistence necessary" for her well-being, and that the cause of his incapacity, *i.e.*, his incarceration and refusal to engage with CUA services, "cannot or will not be remedied." **M.E.P.**, **supra**, 825 A.2d at 1272. **See In re Adoption of S.P.**, 47 A.3d 817, 830 (Pa. 2012) (holding incarceration of parent "can be determinative of the question of whether a parent" is capable to providing essential care to child under subsection(a)(2), and length of confinement is a "highly relevant" consideration as to whether the incapacity of parent can be remedied).

With regard to Father's specific claim that neither DHS nor CUA made reasonable efforts or reunite him with Child, we find this argument specious. The testimony at the November 27, 2018, hearing revealed Child's case manager informed Father of every single case plan meeting, and Father did not participate. **See** N.T., 11/27/2018, at 11-12. Furthermore, after the meetings, the case manager mailed Father a copy of his plan objectives, which included participating in parenting classes while in prison and providing CUA with a list of people who could assist in caring for Child. **See id.** at 12. Again, Father neglected to respond, and did not provide verification that he completed any parenting programs. **See id.** at 13. Moreover, when Child's case manager had difficulty reaching Father by telephone, she asked his prison social worker to intervene. **See id.** at 14. The social worker informed the case manager that "he refused to engage CUA." **Id.** Therefore, the evidence does not support Father's claim that DHS and CUA failed to make reasonable efforts to reunite him with Child.

As we have found the evidence supported the involuntary termination of Father's parental rights under Subsection 2511(a)(2), we next consider whether the juvenile court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b). The requisite analysis is as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotations and some punctuation omitted).

In concluding DHS presented clear and convincing evidence under Subsection 2511(b), the court opined:

> Testimony by Ms. Wright, the CUA case manager[,] provided credible, persuasive testimony regarding the Child's physical and emotional needs, best interests and with whom the Child has a parental bond. She testified that Father was never

- 14 -

involved in caring for the Child at the time she came into her care. She testified Father had never had contact with the Child and that he refused to allow contact with CUA while in prison.

Ms. Wright further noted the Child has been in care approximately 12 months and has been with her foster parent this entire time. She has observed the interaction between the Child and the foster parent and testified the Child looks to [the foster parent] for all of her emotional and physical needs. She refers to the foster parent as "Mama" and looks to her for love, protection and support. It is her opinion that the Child would not suffer irreparable harm if Father's parental rights were terminated because there is no parental bond and Father has never had contact with the Child. Lastly, she opined it would be in the Child's best interests to be adopted.

Here, the totality of the evidence supports the Court's conclusion that termination of Father's parental rights is in the best interest of the Child. This Court found that termination of Father's parental rights met the developmental, physical and emotional needs and welfare of the Child, and the statutory requirements for involuntary termination of his parental rights were met pursuant to 23 Pa.C.S.A. § 2511(b).

Juvenile Court Opinion, 4/17/2019, at 22-23.

Again, we find no abuse of discretion on the part of the juvenile court. There was no evidence presented that Father had ever met Child, or made any attempt to foster a relationship with her, except for perhaps sending one card. *See* N.T., 11/27/2018, at 10, 14-16. Indeed, Child's case manager definitively stated Child and Father share no parent-child bond, and Child would not suffer irreparable harm if Father's rights were terminated. *See id.* at 16-17. Furthermore, Child's current foster home is a pre-adoptive home, Child is thriving physically, emotionally, and developmentally in that home, and Child looks to her foster mother for love, protection and support. *See id.*

at 16-18. Accordingly, Father is entitled to no relief on his challenge to the court's involuntary termination of his parental rights.

Therefore, because our review of Father's claims demonstrates that they do not entitle him to relief, and because our independent review of the record does not reveal any non-frivolous issues overlooked by counsel, we grant counsel's petition to withdraw and affirm both the order and decree entered on January 31, 2019.

Order affirmed. Decree affirmed. Motion to withdraw as counsel granted.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/30/19